Philmore P. FLEMING, dba Philmore Fleming Productions and Roar Records, Plaintiffs,

v.

Colleen MILES, dba CB Design Graphics, Defendant.

No. CIV. 00–1288–JE.

United States District Court, D. Oregon.

June 14, 2001.

William E. Goshert, DuBoff, Dorband Cushing & King, PLLC, Portland, OR, Sarah S. Conley, Sarah S. Conley, PC, Portland, OR, for Plaintiffs.

Lake James Perriguey, Law Works, LLC, Portland, OR, for Defendant.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiff Philmore P. Fleming, dba Philmore Fleming Productions and ROAR Records (Fleming), brings this action for copyright infringement against defendant Colleen Miles, dba CB Design Graphics (Miles). The parties have filed cross-motions for summary judgment.

## BACKGROUND

On December 12, 1997, Fleming registered a copyright covering the melodies, music, and lyrics for 13 songs. The following year, he recorded those songs for inclusion on a compact disk. In August 1998, Fleming hired Dan Frazier (Frazier), aka Piet Sloan, to create artwork for the compact disk and related packaging and promotional materials. Fleming also retained the services of Miles, a graphic artist, on a project-by-project basis at the rate of $50 per hour. The record is unclear in places, but it appears that Miles was initially retained by Fleming in January 1997 in connection with other graphics projects, and was then asked to perform the disputed work beginning in late 1998 or early 1999.

It is undisputed that both Frazier and Miles were independent contractors, and neither signed a work-for-hire agreement or contemporaneous written assignment of rights in favor of Fleming. Fleming testified at deposition that he and Miles did not discuss who would own the copyright to the projects that Miles had been commissioned to perform for Fleming.

At Fleming's request, Miles modified certain designs that Fleming furnished to her (which apparently were originally created by Frazier, either alone or in collaboration with Fleming). Miles also created new artwork for Fleming. The latter was

based, at least in part, upon instructions from Fleming regarding the text, theme, and overall appearance, but Miles played a significant role in the design process and physically created the final product.

The art known as the "Kyrie Eleison insert" credits several persons and companies involved in producing this compact disk. Among those credits is "Cover design: Colleen Miles[,] CB Design Graphics, Portland, OR." The art known as the "CD jacket" includes the credit "Cover design: Philmore and Piet Sloane."

Most of Miles' work was created on a computer and stored in digital form, which could then be printed. Miles used her own equipment and materials to perform the work, with the exception of the art that Fleming had furnished to her which she then modified or incorporated into the final product.

The parties' submissions are not very informative on this issue, but Miles apparently sent the computer files she created to Centerpoint Graphics, which was to print the materials for Fleming. Centerpoint Graphics apparently did at least one press run of certain promotional postcards for Fleming, and perhaps some of the other printed materials as well. Centerpoint Graphics may also have made master films using the computer files obtained from Miles.

Fleming and Miles parted ways in August 1999, after Fleming failed to pay Miles' invoice for her services. Miles then filed a small claims action against Fleming seeking payment.[1] On or about November 3, 1999, an attorney representing Miles, Bartley Day, wrote a letter to the president of Centerpoint Graphics, which stated in relevant part that:

I represent Colleen Miles, a graphics artist, who is presently involved in a dispute with a client of yours, Philmore Fleming. The dispute concerns certain artwork which Mr. Fleming commissioned my client to create in connection with Mr. Fleming's music CD and related promotional materials. Mr. Fleming has not yet paid my client's invoiced charges.

I should mention, before going further, that my client is the copyright owner of the artwork. The federal copyright statute specifically states that commissioned work shall be considered "work for hire" only "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." Since there was no such agreement between my client and Mr. Fleming, my client is the copyright owner of the artwork, and as such has the sole and exclusive right to make copies of artwork (as well as computer files containing the artwork), and to create derivative works based on the original artwork.

Your company has already printed various materials containing my client's artwork, however this letter concerns not what has already been done, but instead possible future action by your company in regards to the artwork. In particular, my client is concerned about the possibility of your company releasing to Mr. Fleming any computer files containing the artwork, and also the possibility of your company using the existing artwork in the course of creating new artwork. Any such activity would infringe upon my client's copyright in the subject artwork.

The letter then described possible civil and criminal penalties for copyright in-

---

**1.** The record does not disclose the outcome of that small claims action, but it likely was subsumed in a later Circuit Court action between the parties.

fringement, and requested that employees of Centerpoint Graphics be informed "of the consequences of engaging in any of the infringing activities mentioned above in regards to my client's artwork."

Fleming's response to this letter does not appear in the record, but it can be inferred from a second letter that Miles sent to the president of Centerpoint Graphics dated November 19, 1999:

> By way of introduction, I am Colleen Miles, the graphic designer and illustrator previously, but never again, working with Mr. Philmore Fleming. I am writing on my own behalf as I ask for your understanding and acceptance of my full retraction of a letter written to you of my council (sic) on 11–2–99. I am told now that my simple and polite letter has veen (sic) viewed as an "intentional interference" (?) whatever that is.
>
> In this previous letter mentioned above, I had simply asked your print house not to release any downloaded archived files that originated from my computer to Mr. Fleming and still do not understand how I could have interfered when all print work I had allowed was complete. Council (sic) for Mr. Fleming believes he can have these files that he has not paid for. I will not be calling on your company again.

At the bottom of the letter appears a handwritten notation, "copy for DuBoff." Leonard DuBoff is an attorney at the law firm that represents Fleming.

Fleming asserts that, in response to the preceding letters, Centerpoint Graphics refused to give him the artwork or computer files, or to print additional press runs using that artwork. On or about January 6, 2000, Fleming filed an action against Miles in Multnomah County Circuit Court, for intentional interference with business relations. The claim was premised upon the letters to Centerpoint

Graphics, and alleged that Miles had falsely represented "that [she] was the owner of the copyright in the work." As a result, Fleming alleged, he had to replace the artwork and have the CD packaging redone, for which he demanded compensation. Fleming later submitted a five-page statement identifying his alleged damages, which included, *inter alia*, lost profits on potential sales of CDs, other lost business opportunities such as film and television licensing rights or investors who allegedly balked at investing in the company because of pending litigation, the cost for promotional campaigns allegedly suspended after the dispute arose, compensation for Fleming's time, "loss of employee productivity," postage, and legal fees. Miles counterclaimed for the outstanding balance on her fee.

On April 21, 2000, the Register of Copyrights received two Certificates of Registration filed by Miles. The first certificate was for the "2D Graphic Design" entitled "Philmore Fleming Kyrie Eleison CD Insert." The second certificate was for the "2D Graphic Design" entitled "Roar Records/Philmore Fleming Ticket Postcard." Miles did not register certificates covering any of the other disputed works.

On May 17, 2000, Fleming deposed Miles as part of discovery in the state court litigation. Fleming questioned Miles about her contributions to each of the disputed works, and about her assertion of copyright ownership. Miles clarified that she was not asserting ownership of the copyright in all of the disputed works, just certain specified works. She disclaimed any claim of copyright for artwork Fleming or Frazier created.

In accordance with state court rules, the parties were required to submit their dispute to arbitration. A party dissatisfied with the results could demand a trial *de novo* in the Circuit Court, though certain

penalties might apply if that party did not better its position at trial. On June 13, 2000, following a two-day arbitration, judgment was entered in favor of Miles on Fleming's claim for tortious interference with business relations and also on her counterclaim for the outstanding balance on her fee. Fleming did not appeal that decision.

Instead, on August 1, 2000, Fleming commenced a new action against Miles in federal court, for copyright infringement. Miles promptly moved to dismiss the action because Fleming had never registered his alleged copyright, which is a prerequisite to maintaining an action for copyright infringement. Fleming voluntarily dismissed that action.

On or about September 5, 2000, Fleming filed with the Register of Copyrights a Certificate of Registration for a "design: photo & 2–D art/photography" entitled "Roar Records logo/Kyrieleison CD insert Philmore 'Dreams of a Journeyman' CD Artwork." Fleming certified that he was the "author" of the work described in the Certificate. One question on the application form was, "Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?" Fleming answered, "no," even though he knew Miles had filed her own copyright registration five months earlier.

Fleming then returned to federal court and filed the present action against Miles for copyright infringement. The Complaint in the federal action, although citing a different legal theory, is largely based on the same factual allegations that Fleming previously asserted in his state court action. Fleming again seeks to be compensated for the damages he allegedly sustained when Centerpoint Graphics refused to release the artwork to him. Fleming demands that Miles give him all the disputed artwork and computer files, and au-thorize Centerpoint Graphics to release the same to him. Fleming also demands one million dollars in punitive damages from Miles.

There are a few new issues in the latest action. Fleming asks the court to issue a declaration that Miles' "fraudulent registration with the Copyright Office" is "void and invalid," and that he is "the exclusive owner of all copyrights associated with the production and promotion of his CD 'Philmore: Dreams of a Journeyman.'" Fleming also asserts that Miles infringed upon his copyrights by entering the disputed artwork in a graphic design contest (which she did not win), and by including the disputed artwork in a portfolio of her work that she furnished to some prospective clients for her graphics design services. Fleming demands payment for "all gains, profits, and advantages derived by Miles through her infringement of Plaintiff's copyrights." Finally, plaintiff seeks his attorney fees and costs.

On January 12, 2001—four days before Miles filed her motion for summary judgment in this action—Dan Frazier executed a sworn notarized document entitled "Transfer of License in Copyrighted Work," which recites in relevant part:

> **Subject Matter:** All artwork originally created by Author for, and licensed by, Philmore Fleming and/or Roar Records

> For valuable consideration received:

> 1. Dan K. Frazier, aka Piet Sloan, (Author) grants a license to CB Design Graphics, Inc. and to Colleen Miles to copy, to display publicly, to create derivative works, and to rework and incorporate in future designs, any and all artwork originally created by Author for Philmore Fleming and/or Roar Records.

2 This license is retroactive to the date of creation of the artwork and extends for the duration of the copyright.

On January 12, 2001, Frazier also executed a sworn affidavit which recites, in relevant part, that:

1. I am the sole copyright owner of all work I created for Philmore Fleming and/or Roar records;

2. I have never transferred, in writing, the copyright in these works to Philmore Fleming, to Roar Records, or to any other third party.

\* \* \* \* \* \*

Fleming responded to this affidavit by producing another document signed by Frazier, entitled "ASSIGNMENT OF INTEREST," which reads, in relevant part:

Subject Matter: All artwork originally created jointly by Author and Philmore Fleming for Roar Records for "Philmore: Dreams of a Journeyman": Compact Diskette

For valuable consideration received:

1. I, Dan K. Frazier, aka Piet Sloan, as joint-author of all original artwork created for the promotion and sale of the Compact Diskette known as "Philmore: Dreams of a Journeyman" do hereby completely assign any and all my interests, including my copyrights, in and to the above-described original artwork to Philmore Fleming and Roar Records.

2. This complete written assignment in the above-described artwork is effective June 1, 1998.

This purported assignment is neither notarized nor dated. Although the document creates the impression that it was executed in 1998, there is reason to believe the document was actually created on or about February 1, 2001.

On February 1, 2001, Frazier also signed an affidavit, prepared by Fleming's counsel, which recites in relevant part:

1. I assigned all my interests in the artwork that I created in consultation with Philmore Fleming for Philmore Fleming's and Roar Records Compact Diskette known as "Philmore: Dreams of a Journeyman" effective June 1, 1998. The CD jacket credit for the cover design "Philmore: Dreams of a Journeyman" serves as evidence of Philmore Fleming's substantial contribution to the creation of this artwork and of our joint authorship.

2. I testified at the May, 2000 arbitration that I had no interest in retaining any copyright or other interests in this artwork, and that I assigned those rights to Philmore Fleming and Roar Records. However, after repeated telephone calls over a period of several weeks by attorney Lake Perriguey, who stated that I held the sole copyright in the artwork, I in good faith and in understanding of Lake Perriguey's assertions signed the license and affidavit on January 12, 2001 for $200.

Miles then countered with an affidavit from her attorney, Lake Perriguey, which recites in relevant part:

2. I invited Dan Frazier to transfer a license in the artwork he'd created for Philmore Fleming to Defendant Miles for $200.

3. After he executed the contract of transfer, and after I served Plaintiff's counsel with the motion for summary judgment which included this transfer as an exhibit, Dan Frazier phoned me and told me that he was going to have to 'retract the transfer' because Plaintiff's lawyers were pressuring him to do so. He told me that he did not want to get involved in a way that would cause Plaintiff to sue him.

4. He told me that he was going to sign the affidavit prepared by Plaintiff's lawyers after he'd already transferred the rights to Defendant Miles.

## DISCUSSION

### A. *Preclusive Effect of Prior Judgment*

Miles argues that Fleming's claims are barred, in whole or in part, by the judgment in the state court action between the parties. Fleming responds that his claims cannot be barred because a state court lacks jurisdiction "to decide copyright issues."

 Although Miles uses the term "issue preclusion," her argument more closely resembles the related *doctrine of* "claim preclusion."[2] Under Oregon law, "a plaintiff who has prosecuted one action against a defendant through to a final judgment binding on the parties is barred on *res judicata* grounds from prosecuting another action against the same defendant where the claim in the second action is one which is based on the same factual transaction that was at issue in the first, seeks a remedy additional or alternative to the one sought earlier, and is of such a nature as could have been joined in the first action." *Rennie v. Freeway Transport,* 294 Or. 319, 323, 656 P.2d 919 (1982). Claim preclusion bars all claims available to the plaintiff arising from the transaction that was at issue irrespective of whether the plaintiff actually asserted those claims in that action. *Id.* at 324, 656 P.2d 919.

 A subsequent action based on the same facts and asserted injury is barred notwithstanding that it asserts a different legal theory to justify recovery. 18 MOORE'S FEDERAL PRACTICE § 131.21[3][a] (3d ed 1997). The final

"judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatsoever." *Nevada v. United States,* 463 U.S. 110, 130, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983), *quoting Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948).

 It is sometimes said that if "the court in the first action would clearly not have had jurisdiction to entertain the omitted theory or ground (or, having jurisdiction, would clearly have declined to exercise it as a matter of discretion), then a second action in a competent court presenting the omitted theory or ground should be held not precluded." RESTATEMENT (SECOND) OF JUDGMENTS, § 25, comment e.

When no court has jurisdiction to hear the entire controversy, the plaintiff cannot be faulted for splitting his claim. The question becomes more difficult when a court does exist that could exercise jurisdiction over the entire controversy, but the plaintiff elects to file his action in a court that lacks jurisdiction to hear the entire matter, as occurred here. The federal court could have exercised jurisdiction over the entire controversy. Instead, Fleming elected to file an action in state court, lost, and then commenced a new lawsuit in federal court premised largely upon the identical events and injuries but asserting different legal theories. As a result, Miles has been forced to incur the time and expense of defending the same action twice.

The case law does not furnish a clear answer. *See* Charles A. Wright, Arthur R. Miller, & Edward Cooper, FEDERAL PRACTICE AND PROCEDURE: JUR-

---

**2.** Even if Miles had not properly asserted the defense of claim preclusion, a federal judge may raise that issue *sua sponte.* *See Clements*

*v. Airport Auth. of Washoe County,* 69 F.3d 321, 329 (9th Cir.1995); *Hawkins v. Risley,* 984 F.2d 321, 324 (9th Cir.1993).

ISDICTION § 4470 (2001 Supplement), pp. 705–07 (discussing the arguments for both sides of this question); *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) ("Our decisions indicate that a state court judgment may in some circumstances have preclusive effect in a subsequent action within the exclusive jurisdiction of the federal courts").

A principal reason for this uncertainty is that the second court (*i.e.,* the federal court) must look to the claim preclusion rules of the first court (*i.e.,* the state court). 28 USC § 1738; *Marrese,* 470 U.S. at 379–81, 105 S.Ct. 1327. However, since the issue arises only in federal court, the state courts have little occasion to decide the issue. This topic is mentioned in two Oregon Supreme Court decisions, but both are clearly dictum and also distinguishable on the facts. *See Rennie,* 294 Or. at 327–28, 656 P.2d 919 (reserving issue); *Van De Hey v. United States National Bank of Oregon,* 313 Or. 86, 93, 829 P.2d 695 (1992) (dictum).

In recent years, Oregon courts have expressed a strong preference for resolving controversies in a single proceeding. For instance, in *Whitaker v. Bank of Newport,* 313 Or. 450, 836 P.2d 695 (1992), the Oregon Supreme Court observed: "There was one judicial proceeding that conveniently could have provided the plaintiff with complete relief, had he sought it. Under the circumstances, claim preclusion was appropriate." *Id.* at 462, 836 P.2d 695 (discussing *Troutman v. Erlandson,* 287 Or. 187, 213, 598 P.2d 1211 (1979)). In *Rennie,* the Oregon Supreme Court stated:

> It may have been plaintiff's preference to split his claim into the state and federal law components and to try them separately, but his unilateral claim-splitting and the consequent multiplicity of

lawsuits the defendants were obligated to defend is precisely the evil sought to be avoided by the *res judicata* doctrine.

> We are convinced that the better rule, the one more consonant with the policies behind *res judicata,* is that a plaintiff must attempt to have all claims against a defendant arising out of one transaction adjudicated in one court in one proceeding, at least insofar as possible, despite the fact that the various claims may be based on different sources of law.

*Rennie,* 294 Or. at 327, 656 P.2d 919.

■ After considering, *inter alia,* Oregon law regarding claim preclusion, any offsetting federal interest, and the equities to the parties, I conclude that Fleming may litigate in this action the question of who owns the copyright, since that issue could not have been adjudicated in the state court action and has prospective implications beyond the facts of the particular dispute previously litigated. For the same reason, I will permit Fleming to pursue his demand for possession of the artwork and computer files. Fleming may also maintain his claim for copyright infringement based on events not at issue in the state court proceeding, specifically, Miles' use of the art in a design contest and in her portfolio.

However, Fleming's claim for damages is barred to the extent it is premised upon the same events at issue in the state court proceeding, such as the letters to Centerpoint Graphics, and the expenses or lost profits allegedly incurred by Fleming as a result of Miles' claim that she owns the copyright or Miles and Centerpoint Graphics' refusal to release the artwork or computer files to Fleming. Those events and damages have already been litigated once

in the state court proceeding.[3] Permitting Fleming to litigate those issues anew here would effectively deny comity to the state court judgment and render that proceeding a nullity.

Moreover, it is difficult to see how this court could render a verdict in favor of Fleming on those issues without determining that the state court decided the earlier case incorrectly. "Where the district court must hold that the state court was wrong in order to find in favor of the plaintiff, the issues presented to both courts are inextricably intertwined" and the *Rooker–Feldman* doctrine requires that the federal court decline jurisdiction. *Doe & Associates Family Law Offices, P.C. v. Napolitano*, 2001 WL 403274 (9th Cir. April 23, 2001) (as amended).

### B. *Fair Use*

"Fair use" of a copyright is not an infringement. Among the non-exclusive factors to be considered in determining whether a particular usage was fair are:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 USC § 107. Miles, as the party asserting the defense of fair use, carries the burden of proof on this issue. *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 918 (2d Cir.1994).

Assuming, *arguendo*, that Fleming owns some copyright interest in the disputed art works, I have little difficulty concluding, as a matter of law, that Miles' use of those works was "fair use."

The disputed art is not the actual product that Fleming sells—as would be the case with a book or painting—but merely promotional literature used to market a compact disk. There is no market, *per se*, for the disputed art itself. Miles included the disputed art in a portfolio containing samples of her work that was shown to a small number (approximately 20) of prospective clients for her graphics design business. That is a "commercial" use only in the narrow sense that Miles hoped to attract additional business by showing samples of her work.[4] Miles was not selling the art itself, nor using the art to sell an unrelated product (*e.g.*, using a Beatles song to sell automobiles).

Fleming is not a graphic artist, and is not competing for business in the same market as Miles. Her use in no way detracts from Fleming's sales or other uses of the art (to the extent there is such a market), nor does it adversely affect the value of the art (assuming it has any value). Because her circumstance is unique,

---

**3.** In any event, it is doubtful whether that conduct constitutes an actionable copyright infringement. With respect to those events, Miles is not accused of copying and using the disputed work. Rather, her assertion of a competing claim of ownership allegedly prevented Fleming from exploiting the work. I am not aware of any case in which a court has held that such conduct constitutes copyright infringement. The *Noerr–Pennington* doctrine may also be implicated. *See White v. Lee*, 227 F.3d 1214, 1230–33 (9th Cir.2000) (explaining doctrine).

**4.** At oral argument, Miles represented that she does not intend to use the disputed art in future promotional portfolios.

there is no potential for a cumulative adverse impact through repetition by others.[5]

That Fleming may have provided some of the ideas, text, or even some art (indirectly through Frazier) is not controlling. Part of the job of a graphic artist such as Miles is to transform a client's ideas into a marketing brochure or other literature. By analogy, when a printer shows samples of books he has printed to a prospective client, it is the quality of the printing, not of the writing, that concerns the client. Although the precise contributions of each party may be in dispute, there is no doubt that Miles contributed a significant percentage of the artistry involved in creating (or in some cases, altering) this art. Indeed, that is why Fleming retained her services in the first place. Fleming was not paying Miles fifty dollars an hour to perform work that he could readily create on his own.

█ For the same reasons, Miles' entry of the disputed art in a design contest for graphics artists also was "fair use."

### C. *17 USC § 412*

█ 17 USC § 412 prohibits an award of statutory damages or attorney fees for:

(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

All of the alleged infringing acts fall within the scope of this prohibition. In fact, Fleming had to dismiss his first attempt at filing this action after Miles pointed out that he had failed to register his alleged copyright. Accordingly, Fleming may not recover statutory damages or attorney fees even if he prevails on his infringement claims. *See Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1012 (2d Cir.1995); *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 142–44 (5th Cir.1992); *Robert R. Jones Associates, Inc. v. Nino Homes*, 858 F.2d 274, 281 (6th Cir.1988).[6]

### D. *Actual Damages*

█ Even assuming that Fleming has any copyright interest in the disputed art, and that Miles' use was not fair use, Fleming could not recover any compensatory damages. There is no evidence that he lost any sales as a result of the alleged infringement, or that Miles profited thereby. A few of the prospective clients who viewed Miles' portfolio have since decided to use her services, but it would be pure speculation to suggest that this one item (from among the entire portfolio) was responsible for inducing these clients to use her services. Certainly the record contains no evidence to support that contention. Requiring Miles to disgorge all of the profits she earned through her labors

---

**5.** At oral argument, Miles stated that Fleming had verbally agreed to give her 250 copies of the printed Kyrie Eleison insert to use in promoting her graphics design business. If true, her use was not only fair but consensual. However, because that statement had not been mentioned in the written submissions, I do not rely upon it in deciding these motions.

**6.** The lyrics to the song Kyrie Eleison, for which Fleming may have registered a copyright at an earlier date, are reprinted on the back of the Kyrie Eleison insert. However, the insert indicates that the lyrics are "reprinted by kind permission." Fleming approved the wording of the insert and the use of those lyrics. Moreover, the dispute here concerns alleged infringement of the copyright to the insert artwork, not music or lyrics.

for those new clients, on projects unrelated to the work she performed for Fleming, would also be an unjustified windfall for Fleming.

### E. *Effect of Omitted Information*

 The knowing failure to advise the Copyright Office of facts that might have occasioned a rejection of the application constitutes reason for holding the registration invalid and thus incapable of supporting an infringement action, or to deny enforcement on the ground of unclean hands. *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F.Supp. 980, 987–88 (S.D.N.Y.1980) (citing cases).

Fleming argues that Miles' registration should be held invalid on this ground, because—when she filed her registration— Miles failed to advise the copyright office of Fleming's competing claim. However, the registration form does not request information regarding competing *unregistered* claims. In any event, this is the pot calling the kettle black.

 When Fleming filed his copyright registration certificate on September 5, 2000, one question on the application form was, "Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?" Fleming answered, "no," even though he knew Miles had filed her own copyright registration five months earlier. Moreover, only weeks before Fleming submitted his application, he had filed a lawsuit against Miles seeking a judicial determination regarding ownership of these copyrights. Had Fleming correctly answered this question on his application, the Copyright Office would have known that ownership of these copyrights was disputed, and

might have denied Fleming's application or made further inquiry.

At the time Fleming submitted this application, he was represented by a law firm that holds itself out as possessing special expertise in the field of intellectual property. Additionally, when Fleming filed his 1997 copyright application, he was careful to answer the same question "yes," and to disclose that the song "Kyrie Eleison" had previously been copyrighted in 1983 and explain why he was entitled to a new registration.

Fleming clearly understood the question, yet, when filing his September 2000 copyright application, chose not to inform the Copyright Office of Miles' competing claim and prior copyright registration.[7] Fleming's conduct was considerably more egregious than that of Miles. She allegedly failed to advise the Copyright Office of a competing (but unregistered) claim of copyright, but the registration form does not request that information. By contrast, Fleming concealed a competing copyright registration, and affirmatively denied the existence of that registration.

Under the circumstances, I conclude that Fleming may not recover damages from Miles. *Id.* Since Miles is not seeking damages from Fleming, I need not decide whether her alleged omission would justify a similar result.

### F. *Ownership of the Disputed Copyrights*

Once the collateral issues such as infringement and damages have been stripped away, the remaining question is whether Miles or Fleming, or both, will control the copyright after this case is over.

---

**7.** Fleming notified the Copyright Office of Miles' competing registration in a letter dated

May 1, 2001, almost two months after I mentioned this omission during oral argument.

Under the Copyright Act of 1976, the copyright "vests initially in the author or authors of the work." 17 USC § 201(a). The Copyright Act of 1976 departs from earlier versions of the copyright laws by vesting the copyright, in most cases, in the person who actually creates the work instead of in the person paying to have the work created. "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).

An exception exists for a "work made for hire," *id.,* but that term is defined fairly narrowly with respect to independent contractors. 17 USC § 101. If the proposed work falls within the scope defined in § 101, the parties may expressly agree it is to be a "work for hire" and the copyright vests in the commissioning party. Otherwise, it is incumbent upon the commissioning party to protect its interests by ensuring that the contract between the parties conveys a license to use the copyrighted work or an assignment of the rights, or spells out the terms for obtaining such rights in the future. The 1976 Act, as interpreted in *Community for Creative Non-Violence,* "unquestionably place[s] on commissioning parties the burden of obtaining written agreements. An advertiser, for example, will need a written assignment of copyright to own the ads it commissions." William S. Strong, THE COPYRIGHT BOOK, p. 43 (4th ed.1993).

The parties agree that the work performed by Miles was not a "work made for hire." Nor did Fleming protect his interests by obtaining a license or assignment from Miles. Instead, Fleming contends that he is the copyright owner because he furnished the ideas and words,

directed the work, and in some cases supplied art (which he obtained from Frazier) which was incorporated into the final product. Even assuming that were true, it does not necessarily mean that Fleming owns the copyright and Miles does not.

There is a split of authority on whether the author is the person who actually prepares the artwork, *i.e.,* by fixing the idea into a tangible medium of expression, or whether a person who directs the artist is the actual author, or whether they are "joint authors."

One line of cases is exemplified by *Johannsen v. Brown,* 797 F.Supp. 835 (D.Or. 1992). The owner of a magazine aimed at Grateful Dead fans commissioned an artist to create an illustration for the cover. The owner specified the theme, which was to be a parody of the painting "American Gothic," with two skeletons and a guitar substituted in place of the farmers and pitchfork. The owner selected the title of the illustration, and specified all details, including colors, hair style, and jewelry. Nevertheless, Judge Frye held that the owner had no copyright interest at all. He was neither the author nor a joint author, because he merely described to the artist what the commissioned work should look like. *Id.* at 842.

*S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081 (9th Cir.1989), concerned the rights to a computer program. The defendant told the programmers what tasks the software was to perform, and how it was to sort data, but did not actually write the software. The Ninth Circuit held that the defendant was not a joint author. "A person who merely describes to an author what the commissioned work should do or look like is not a joint author ... To be an author, one must supply more than mere direction or ideas: one must 'translate [ ] an idea into a fixed tangible expression

entitled to copyright protection.'" *Id.* at 1087.

The *S.O.S.* court cited, with approval, *Whelan Assocs. v. Jaslow Dental Lab.*, 609 F.Supp. 1307 (E.D.Pa.1985), *aff'd* 797 F.2d 1222 (3d Cir.1986). In that case, a dental laboratory owner commissioned software for use in his business, provided the programmers with detail information regarding his business, dictated the functions the software was to perform, and helped design the language and format of some of the visual displays. The court nonetheless found that the programmer was the sole author of the software. *Id.* at 1318–19.

A similar issue arises when the person commissioning the work provides rough sketches. Most published decisions conclude that the person providing the rough sketches is not an author. *See, e.g., M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir.1990) (ideas conveyed by client to architect, including thumbnail sketch, did not make client a joint author of the final plans).

In *Community for Creative Non–Violence*, 490 U.S. 730, 109 S.Ct. 2166, the plaintiff CCNV commissioned a sculpture. CCNV conceived the idea and theme for the sculpture, a nativity scene with two adult figures and an infant depicted as homeless people huddled on a steam grate. CCNV decided that the family was to be black, the figures would be life-sized, and the steam grate would be on a pedestal containing concealed special effects equipment emitting simulated steam. CCNV provided both the title and the legend to be inscribed on the pedestal. CCNV approved the choice of materials, sketches of the figures, decided how the figures would be positioned, and rejected the artist's pro-posal to use suitcases or shopping bags to hold the family's belonging and insisted that it be a shopping cart. CCNV also visited the sculptor on a number of occasions to review his progress. Despite this degree of involvement, the Supreme Court rejected CCNV's contention that it was the author of the sculpture.[8]

The second line of cases is exemplified by *Andrien v. Southern Ocean County Chamber of Commerce*, 927 F.2d 132 (3d Cir.1991). In *Andrien*, the plaintiff prepared a rough draft of a map, which "used varied scales and almost illegible street names." He took his draft to a printer, which coordinated the scales, relettered the street names, added additional information, and created a large paste-up version, which was then reduced to a smaller size and printed. Although the printer created most of the final artwork, the court concluded that the plaintiff was either the sole author or, at least, a joint author.

The *Andrien* court noted that the Copyright Act defines a work as "fixed" in a tangible medium of expression when "its embodiment in a copy . . . *by or under the authority of the author*, is sufficiently permanent to permit it to be . . . reproduced." 17 USC § 101 (emphasis added). The court reasoned that writers are entitled to copyright protection "even if they do not run the printing presses or process the photographic plates necessary to fix the writings into book form." *Andrien*, 927 F.2d at 135. However, the court hastened to add, for the "under the authority of" exception to apply, the "process must be rote or mechanical transcription that does not require intellectual modification or highly technical enhancement . . ." *Id.* (dis-

---

8. The Court did hold open the possibility that, on remand, CCNV could attempt to prove that it was a "joint author." *Id.* at 753, 109 S.Ct. 2166. However, it is unclear whether that was based upon the contributions described above, or because CCNV provided the pedestal and steam grate which was integrated into the sculpture.

tinguishing *M.G.B.* and *Whelan Assocs, supra).* *See also Fisher v. Klein,* 16 USPQ2d 1795 (S.D.N.Y.1990) (the author of a hypothetical sculpture, made from I-beams that had to be placed by crane, is the person directing placement of the beams and not the crane operator); Russ Versteeg, "Defining 'Author' for Purposes of Copyright," 45 AM U L REV 1323, 1365 (June 1996) (arguing that, to "ascertain whether someone is an author," the court should ask "whether he has communicated original expression, either directly (through personal fixation) or indirectly (through authorizing another to fix it)"); NIMMER ON COPYRIGHT § 1.06[B] (arguing that "the originator, rather than the fixer, should be deemed the 'author' ").

Although the record is sparse, the court has viewed several rough sketches that Fleming drew (for the logo, Ticket Post-card, and Kyrie Eleison insert). Even to the untrained eye, the finished art is considerably more sophisticated than the crude sketches prepared by Fleming. The process by which those rough sketches were transformed into the finished art was not a mere "rote or mechanical transcription that does not require intellectual modification or highly technical enhancement ..." *Andrien,* 927 F.2d at 135. It required and utilized the talents of a graphics designer, which is why Fleming retained the services of Frazier and Miles.

From the record before the court, Miles appears to be at least a joint author of the Kyrie Eleison insert and the Ticket Post-card, the only two items in which she has claimed a copyright. On this record, I am unable to determine, as a matter of law, whether Miles is the sole author or whether Miles and Fleming are joint authors.[9] That will have to be sorted out at trial, unless the parties stipulate to the material facts.[10]

With respect to the other art in dispute, Miles claims an interest in that art by virtue of an assignment executed by Frazier. However, Fleming claims that Frazier had previously assigned the same rights to him. Fleming further contends that he and Frazier were joint authors of that artwork. Whether Fleming has an interest in that artwork as a joint author with Frazier cannot be resolved on summary judgment. Frazier's own contradictory affidavits and purported transfers are sufficient to create a factual dispute for trial.

With regard to the validity of the conflicting assignments executed by Frazier, 17 USC § 204(a) provides that:

> A transfer of copyright ownership, other than by operation of law, is **not valid** unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of

---

**9.** A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole. 17 USC § 101. Each author must make "an independently copyrightable contribution" to the disputed work. *Aalmuhammed v. Lee,* 202 F.3d 1227, 1231 (9th Cir.2000). "In the absence of a contract, the inquiry must of necessity focus on the facts." *Id.* at 1235.

**10.** Although a party may demand a jury trial for a copyright infringement claim, it is less clear whether there is a right to a jury trial if the sole claim to be tried seeks a declaratory

judgment voiding one party's copyright registration and declaring the other party to be the true owner of the copyright. *See* Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 2312 ("An action for a declaratory judgment with regard to patents or copyrights will give rise to a right to trial by jury if there would have been such a right in the coercive action that otherwise would have been required. [However,] there may be no right to a jury in the rare cases in which all that is sought is a declaration that the defendant's patent is invalid or not infringed ...").

the rights conveyed or such owner's duly authorized agent.

(emphasis added). The threshold question is whether an alleged oral assignment "effective June 1, 1998" can be retroactively ratified by an undated writing that appears to have been executed in 2001. The answer would appear to be no, at least under the circumstances of this case. In *Konigsberg Intl. Inc. v. Rice*, 16 F.3d 355 (9th Cir.1994), the court concluded that "the writing in question must, at the very least, be executed more or less contemporaneously with the agreement and must be a product of the parties' negotiations." *Id.* at 357. Unlike a statute of frauds, in which the writing serves a purely evidentiary function, "a transfer of copyright is simply 'not valid' without a writing." *Id.* The court held that a writing that purported to ratify an alleged oral transfer, "written three and a half years after the alleged oral agreement, a year and a half after its alleged term would have expired and 6 months into a contentious lawsuit ... was not substantially contemporaneous with the oral agreement." *Id.* By contrast, the writing by Frazier was apparently executed almost three years after the alleged agreement, after almost a year of litigation, and one day before Fleming filed his reply brief in support of his motion for summary judgment.

In *Magnuson v. Video Yesteryear*, 85 F.3d 1424 (9th Cir.1996), a Ninth Circuit panel distinguished *Konigsberg*. In *Magnuson*, the defendant allegedly infringed a copyright originally held by Corporation–A and then orally transferred to Corporation–B (and ratified by a subsequent writing years later). The registration of Cor-

poration–A was eventually suspended for failure to pay state franchise taxes, hence A could not maintain a lawsuit. When B brought suit, the defendant argued that the transfer to B was invalid, hence B was not a proper plaintiff. The Ninth Circuit disagreed, reasoning that so long as A and B were both satisfied, the infringer could not assert this as a defense. Although not expressly framed in such terms, the court was essentially saying that a stranger lacks standing to assert A's alleged rights against B when A declines to assert them himself.[11] The defendant had no right to infringe the copyright, regardless of whether it was owned by A or B.

As between the two cases, *Konigsberg* most closely resembles the facts of the present case. *Magnuson* was interpreting the 1909 Copyright Act, while *Konigsberg* was interpreting the 1976 Copyright Act (the latter being applicable to this case). In *Magnuson*, the defendant was a stranger and there was no dispute between the alleged transferor and transferee, nor did the lawfulness of the alleged infringer's conduct depend on the validity of the assignment.

Here, by contrast, Frazier executed a written license of rights to Miles, then later claimed that he had previously made an oral transfer of all his rights to Fleming. As in *Konigsberg*, the validity of that oral transfer itself is in dispute, and the person challenging that transfer is not a stranger to the agreement but a person who claims to have acquired a license, for value, from Frazier (which claim is intertwined with the validity of the alleged prior oral transfer).

**11.** *Cf Ringler v. Ruby*, 117 Or. 455, 460, 244 P. 509 (1926) (statute of frauds may not be asserted by a stranger to the agreement); *City of Medford v. Bessonette*, 255 Or. 53, 58, 463 P.2d 865 (1970). *See also Imperial Residential Design, Inc. v. Palms Development Group*,

*Inc.*, 70 F.3d 96, 99 (11th Cir.1995) (where there is no dispute between the copyright owner and transferee about the status of the copyright, a third party infringer may not invoke § 204(a) to avoid suit for copyright infringement).

My preliminary conclusion is that the alleged oral transfer from Frazier to Fleming was "not valid," 17 USC § 204(a), given the circumstances of this case. However, since this issue arose late in the briefing, the parties have not had a chance to fully brief it. Accordingly, I defer a final ruling on that question.

A related issue is the significance of 17 USC § 205(d) and (e), which provide as follows:

(d) Priority Between Conflicting Transfers.—As between two conflicting transfers, the one executed first prevails if it is recorded, in the manner required to give constructive notice under subsection (c), within one month after its execution in the United States or within two months after its execution outside the United States, or at any time before recordation in such manner of the later transfer. Otherwise the later transfer prevails if recorded first in such manner, and if taken in good faith, for valuable consideration or on the basis of a binding promise to pay royalties, and without notice of the earlier transfer.

(e) Priority Between Conflicting Transfer of Ownership and Nonexclusive License.—A nonexclusive license, whether recorded or not, prevails over a conflicting transfer of copyright ownership if the license is evidenced by a written instrument signed by the owner of the rights licensed or such owner's duly authorized agent, and if—

(1) the license was taken before execution of the transfer; or

(2) the license was taken in good faith before recordation of the transfer and without notice of it.

Again, because this issue arose late in the briefing cycle, the record does not indicate whether or when the transfer was recorded. It also is not clear, on this record, whether Miles' non-exclusive li-cense "was taken before execution of the [alleged] transfer" to Fleming or "in good faith ... and without notice of it." The latter may be a disputed question of fact, in light of Frazier's conflicting affidavits. However, the court could resolve that question as a matter of law if the oral transfer to Frazier was invalid, or if the term "executed" means a writing as opposed to an alleged oral transfer. Frazier's written license to Miles was almost certainly executed prior to his (undated) written transfer of rights to Fleming.

Even if Frazier's subsequent writing could retroactively ratify his alleged oral transfer to Fleming, Frazier's own conflicting affidavits create a factual question as to whether Frazier did in fact make such an oral transfer to Fleming and when.

To summarize, a trial will be necessary to determine whether Fleming is an author or joint author of the Kyrie Eleison insert and Ticket Postcard, unless the parties can agree on a set of stipulated facts that the court can consider as a matter of law. A trial will also be required to determine whether Frazier orally transferred his rights in any of the disputed art to Fleming in 1998, unless I determine as a matter of law (following briefing by the parties) that the subsequent writing did not retroactively validate the alleged oral transfer or that Miles' license takes precedence under § 205(e). A trial may also be necessary to determine whether Miles' license from Frazier was taken in good faith and without notice of the alleged prior transfer to Fleming.

Whether the parties wish to proceed to trial is another matter. At oral argument, Miles indicated that she had little interest in retaining the copyright to these items and was prepared to convey them to Fleming in order to resolve this case. Despite that, the parties were unable to settle this

matter, perhaps because of some other outstanding issues such as claims for damages and attorney fees.

My ruling here makes clear that neither side is entitled to recover actual, statutory, or punitive damages. Fleming also is not entitled to recover attorney fees, both because his infringement claim failed and because his copyright was not registered when the alleged infringement commenced. Miles may be entitled to attorney fees and costs for successfully defending against certain of Fleming's claims, though the court has broad discretion in deciding whether to make such an award or the amount thereof. *See* 17 USC § 505; *Fogerty v. Fantasy,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), *on remand,* 94 F.3d 553 (9th Cir.1996); *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,* 122 F.3d 1211, 1229 (9th Cir. 1997) ("district courts are given wide latitude to exercise 'equitable discretion'" in determining whether to award attorney fees and the amount); *Diamond Star Building Corp. v. Freed,* 30 F.3d 503 (4th Cir.1994); *Gamma Audio & Video, Inc. v. Ean–Chea,* 11 F.3d 1106 (1st Cir.1993) (district court did not abuse its discretion by awarding only $12,500 in fees and costs even though fee petition requested seven times that amount).

The parties have until July 15, 2001, to advise the court whether this matter has been settled. If it is not settled, I will set a trial date and schedule for any additional briefing.

## CONCLUSION

Defendant's motion (# 11) for summary judgment is GRANTED IN PART AND DENIED IN PART as stated in the opinion. Plaintiff's cross-motion (# 19) for summary judgment is DENIED. The parties have until July 15, 2001, to advise

the court whether this matter has been settled.